Call the first case. You know there's three of them. Case number 14-0595 Parkside v. Tremont Realty Capital. Please step up and identify yourselves. For the record, Terrence Heithen, I represent the appellant, Parkside Applied LLC. Eric Freeland, Your Honor, I represent the defendant, Tremont Realty Capital. And you basically know 15 minutes, 15 minutes, but if there's a lot of questions, understand that we may give you a little more time. But don't do as one did two weeks ago. He wanted to see if he could make the clock go round and round, and he just kept repeating everything he said. So with that, go ahead. Is there any rebuttal at all, Your Honor? Yeah. Yeah, you indicate the amount of time you hope to say. Out of the 15 minutes? Rebuttal is usually about five. Thank you. All right. Proceed. I have to admit I'm a little nervous. I haven't done this for approximately 10 years. But my name is Terrence. Of course, you know who I am. Good morning, ladies and gentlemen of the appellate court. I broke down my argument into three basic areas that I thought were the main issues in the litigation, the main issues on appeal. The first issue is the breach of contract issue. And when you alleged that the defendant breached the contract because they didn't perform certain acts and they aren't entitled to their fee, yet the contract that your client signed required him to pay Tremont a fee, even if they found financing on their own. Under what theory would you be less liable to pay the fee if you did financing through a party that Tremont introduced you to? Say it again, Judge. I'm sorry. My understanding of the contract is that Parkside was required to pay Tremont a fee. Correct. And if Parkside was able to somehow get financing independent of Tremont during the contract period, that they would still be required to pay Tremont a fee. Correct, Judge. Now, in this case, Tremont introduced you to another party. And you're saying because they didn't do certain work, they're not entitled to a fee. So what I'm asking you, since your client would be required to pay a fee, even if they found their own financing, what would make it so that they'd be less responsible to pay a fee if they got financing through a party that Tremont introduced them to? That's an excellent question, Judge. I think the basis of our breach of contract is that Tremont obligated itself to perform certain tasks on two different agreements, the financial consultant agreement and the development consultant agreement. And we're alleged that they didn't complete those tasks. One of those tasks was to obtain a loan on behalf of Parkside. Tremont was to obtain the loan. Does the contract counsel indicate what manner or by what means the financing was to be obtained? Was Tremont limited in any way? Judge, I think that Tremont was, it wasn't limited pursuant to the terms of the agreement itself in the sense, but it was limited in the terms of the duties and responsibilities it was supposed to perform under the agreements. I mean, for instance, they were supposed to negotiate the debt financing on behalf of Parkside. Tremont was. To me, negotiate the financing on behalf of Parkside means that you're involved in the process of obtaining the loan. Obviously, the facts in this case, Your Honor, was that they, when the case, when Parkside was handed off in terms of obtaining a loan to North American Capital Markets, who is also a mortgage broker, and so they're supposed to obtain a loan. I mean, the fact is that, the fact of the matter is that they handed their responsibilities off to another mortgage broker when Parkside retained them and paid them $325,000 to obtain a loan on their behalf. I mean, at contract formation, they weren't intending on paying an additional fee for another mortgage broker to come in and provide the services that Parkside already paid them or agreed to pay them to perform. Was Parkside required to accept any particular lender offered by Tremont? Parkside wasn't required to accept any offer. They had the ability to say no at any point in time. But the problem, Your Honor, was that when it got toward the end of the time when they made the decision to accept or they had to reject the loan, they were, as my brief says, they were put in Hobson's choice. They could either accept the loan and, as presented as it was represented to them, the loan was that it had a construction component to it. They agreed that, I mean, when the contract formation occurred, okay, I mean, I think everybody, I think all parties were on board that here's what Parkside was looking for. I'm going to give you the parameters. I'm coming in to you as a mortgage broker. I'm coming to you. This is the loan I want. I want a $9.5 or $10 million loan because I've got investors that I've got to pay back. I've got to get the construction going rather rapidly. I've got to get the units up. I've got to get it built. I've got to pay the investors back. So the understanding of the parameters was I need a $9.5 or $10 million loan. Okay. The problem that I have with this case, and that's why I'm here today, that's why we filed it, one of the major reasons we filed the appeal, except I also see this as a huge legal issue with agency, is that obviously Parkside paid for not only an acquisition loan, but they paid for a construction loan. So the fees were front-loaded by Tremont. The fees were front-loaded in the sense that Tremont was going to get paid its fees for obtaining a loan, and the loan they obtained, the loan they received, was for acquisition only when they paid fees to also obtain a construction loan. But what about the proximate cause argument that your party didn't do anything as far as the pre-sale condos? They didn't do any. They didn't sell one. Judge, I think that... Doesn't that neutralize or negate anything that you can raise if your party didn't do anything? No, Judge, I don't think it does, and here's why I don't think it does. I think the pre-sale requirement is a requirement... In other words, the liability attaches, as far as we're concerned, at the point in time of Tremont's conduct between the time of contract formation and closing. In other words, they failed to perform some duties and responsibilities under the contractual terms during that period of time, and that's when the breach occurred. So the breach occurred prior to any issue of pre-sales whatsoever. Well, it would have failed anyway. Judge, the damages that Parkside is alleging is the damages that they paid for a construction loan they never received. They paid North America Capital Markets $104,000 additional dollars based upon obtaining a $10 million loan. But they're not a crime to disappeal, right? They are a party of judges, but I think they went bankrupt. I think they're in the process. We couldn't find them. They were out of business. Well, Tremont is claiming that there were two contracts, and one, of course, was for the acquisition loan, and there was another contract for the construction, and they're arguing that in the acquisition of this construction loan, they had to do work that your client didn't have the facilities or the manpower to do, and that they were entitled to that money because of the work that they did. It goes over and beyond what a mortgage broker would normally do, and that therefore they were entitled to those funds, not that they were getting a commission on a loan, but rather that they were entitled to that extra work. What would your response be? Judge, if you look at the development consultant loan, it is for, you would presume as a person walking in, part of the problem here, Your Honor, is that there is such a disparity between the knowledge that my client had and the knowledge first time. But that's what your client was paying for, for that knowledge that he had. Correct. That's absolutely the point, Judge. So he's paying for the knowledge that he didn't have. He signed two agreements. One of them was the development loan. If you look at all of what Tremont was required to do under the terms of the development loan, it all relates to obtaining the loan. So is the breach limited to failing to directly or more personally obtain the loan, or is the breach related to the failure to perform under the consulting agreement as well? I think it's a general failure, Your Honor, that occurred because Parkside paid fees, okay, they agreed to pay fees when it signed a contract formation to obtain a $9.5 to $10 million loan. It actually paid those fees. It paid fees based upon the amount obtained in a $9.5 to $10 million loan. Parkside received, I'm sorry, North America Capital Markets received $237,000, if my memory is correct, which represents 2% of $10 million, not 2% of the $4.4 million. He actually signed off on that before the closing. He did sign off, Your Honor, but he signed off under the understanding that more money was committed and that he was going to obtain the balance of the loan. He wasn't going to have to renegotiate anything with Bank of Bozeman. Bank of Bozeman was not committed to doing anything other than its initial, what we call its initial funding of the $4.4. In other words, my client was put in the position of having to go back and spend additional fees in the future and attempt to refinance when that wasn't their understanding of what was going on. When we talk about damages, whether it was always understood that before the second phase of a loan would be committed, whether it's from Bozeman or some other entity, that there was a requirement that 50% of the units would be sold and whether they reached or not, this never would have happened in this case because the 50% of the units were never sold. I understand what Your Honor is saying. Again, I think that the units didn't sell is irrelevant as far as plaintiff is concerned in terms of what happened because what happened is they retained Tremont to obtain a loan in the amount of $9.5 or $10 million on their behalf. They paid fees based upon that number. But isn't it true, or you can correct me if I'm in error, neither of the contracts referenced $9.5 to $10 million, did they? That's correct, Judge. It doesn't. It says senior acquisition loan is what most people think. So then the success fee that appears in both contracts is simply based on Tremont's performance under the agreements, not based necessarily on the amount of the loans. That's correct, Judge. Okay, that is correct. I'll try to just read something. I mean, I wrote it down for a reason. Maybe I'll answer Your Honor's question by reading it because I'm not explaining it well enough on my feet for some reason. I must be getting up in age. I don't know. If Parkside would have paid fees related solely to acquisition of the property, Parkside's losses would have been minimized. However, the loan actually negotiated on Parkside's behalf placed Parkside in the position of paying upfront loan fees to Tremont and North America capital markets related to obtaining both an acquisition and construction loan, but the construction loan was never negotiated or committed to by the Bank of Bozeman. And that's the problem that Plaintiff has with what happened here. These fees by Tremont under the agreements that they had were front loaded and Tremont's total favored. So they got their fees based upon obtaining both an acquisition and a construction loan, and the construction loan was never formed and never committed to by the bank. That's not fair. That's not fair. I mean, that gets to the issue of a breach of fiduciary duties. Counsel, did either of the experts testify that the upfront fees, as you described them or characterized them, were uncharacteristic or unique in any way in these types of contracts? I think Plaintiff's expert testified. I think they both did in a way, Your Honor. I think Dr. Musil testified that the fee that Parkside paid to North America capital markets was a duplicate of the fee that wasn't necessary. I mean, because what the Plaintiff's expert said was they're doing the same thing. We're pending the loan on Parkside's behalf. Your Honor, not that it was somehow odd that these contracts would include such a fee provision. Not odd in the sense that they're not out of nonsense, Your Honor. I think what Plaintiff's expert was saying is that the two agreements are actually one agreement. The purpose of both agreements was to obtain a loan on Parkside's behalf. Not only obtain a loan, but obtain a loan to construct the property. Otherwise, it doesn't make sense for the Plaintiff. If you're a Plaintiff and you're going in and you're negotiating a contract, which is what Parkside and Fremont was doing initially, you say, well, what are your fees? Well, our fee is $325,000. Well, he's a CPA accountant. He can do the numbers in his head. $325,000 of $10 million sounds like a reasonable fee. Sure, let me sign the agreement. That's not what happened here. You get down, you get to the point of closing, all of a sudden it's a $4.4 million loan. All of a sudden he's not paying 3%. I mean, what the numbers work out to is he's paying 12% on a loan that he assumed when he negotiated the deal that he was getting a $9.5 to $10 million package to acquire and develop the property. He paid fees. He actually paid fees based upon that representation, and his understanding is that's what Fremont was going to perform for him. The fees were front-loaded so that Parkside was required to pay those fees regardless of whether or not the construction loan was even ever committed to by the defendant. The agreement is required that Fremont negotiate these fees. The evidence in the record is clear that Fremont dropped out of performing any services whatsoever past May of 2006, four months before closing when North America Capital Markets came on board. Anything further? Well, Judge, on that issue, on that particular issue? No, no, I'm saying move along if you've got other things you want to address. Yes. Judge, on the agency issue, our position, the appellate's position, is the judge uses the wrong analytical principles when analyzing the agency issue. She was focused on a case that I did a three- or four-page analysis of, the Kapelrowski, I probably pronounced it wrong, versus Gresham case, which is actually a personal injury case where the issue of agency comes at issue in that case because two defendants, one defendant is potentially an agent of another defendant on an automobile accident, and the standard is the right to control the manner in which an agent performs his work. I think that's what primarily the trial court focused on on the agency issue. The problem I have with that is, first of all, if you read the trial court's opinion in the appellee's brief, all the cases they cite in Illinois, okay, none of those cases that they cite include the parties of a mortgage broker and a borrower. Did you say all federal cases? My cases, I mean, in which I think the appellee agrees in his brief, are from the federal court and district of Illinois, are all mortgage broker and borrower cases. And I think that those cases, all of them, I don't, all of them state that the standard to determine whether or not a fiduciary relationship exists is almost, it's been codified in Illinois on the residential side a little bit after. But not on the commercial. But not on the commercial side. But even on the commercial side, even before the codification, I couldn't find one case that said that there wasn't a fiduciary relationship between a broker and a borrower. I mean, if you think about it, if you're going in as a borrower and your parkside retained Tremont to find a loan on their behalf, what are they if they're not an agent? Well, that suggests, Your Honor, that they're arm's length. But, and I think that's what the court implied by its ruling. But if Your Honor looks at the cases in Illinois, I think it's very clear what the cases in Illinois state. They state that the relationship is one of fiduciary relationship when it comes between a broker and a borrower, particularly down the Alborada case, I think it's like that, when there's an exclusive agreement for exclusive representation, broker representation, where parksides precluded from going to any third party for any advice or consent or any competing ideals whatsoever. I mean, parksides were locked and clammed at that point in time. They couldn't even go to Central Pacific Bank and obtain a loan on their own, which they did on another development, because the agreement precluded them from doing so. So they're a locked-in client. And the appellant's position is that the right analysis should have been that the particular relationship this mortgage broker had with parkside or any commercial mortgage broker had with parkside, because of the exclusive nature of the agreement, there should have been a preponderance. There's a tipping point almost exclusively in parkside's favor just because of the nature of the relationship. Special circumstances of the parties' relationship is one way that the Illinois courts have found that a fiduciary duty arises. When we hear these cases, we're bound by the standard of review that the fellow court hears these cases under. And our Supreme Court has held on several occasions that when we look at a trial court's finding of whether or not there was an agency relationship after a trial, we can only reverse if that decision is against the manifest weight of evidence. And what that means is we can only reverse if the opposite conclusion is clearly evident. Not that we might go a different way, but that an opposite conclusion is clearly evident. How would you state that an opposite conclusion here is clearly evident? I think there's two issues there, Your Honor. First of all, it's a question of law. I understand that the review was de novo, not manifest weight of evidence. I might be wrong on that. I mean, I defer to the appellate court here. But the research I did is that if it's a direct question of law, which I think this is, which standard applies? Because in our opinion, the judge went down the wrong analysis. She should have been looking at the dominance and influence factors between Parkside and Tremont. She did mention the case, I think it's the Benson v. Stratford distinction case, which is a case which better analyzes a relationship between a mortgage broker and a borrower than the Kaporosky case. In that case, the superiority that Tremont had, and it's in the business of obtaining commercial loans. So it had a gross disparity of knowledge and expertise in the area of obtaining loans that worked entirely in its favor. That indicates that there is a dominance factor there because, I mean, if you know more, I mean, if I go into a lawyer or a doctor's office, you know, and they tell me, they give me advice of what to do or what not to do or let's go with the North American capital markets because they can obtain this loan when no one else can, I'm going to listen to them. So there's a dominating factor there and a controlling factor there that I think that is missing in the analysis of the trial court. The trial court focused its attention in making an agency determination on the control factor. Correct. You argue in your briefs that the control factor is a factor but not necessarily the sole factor. Correct. My point is that the trial court then made findings of fact with respect to an agency determination, noting in the first instance that the common law did not provide for an agency relationship out of the broker-borrower relationship. How then are we to treat the trial court's determination with respect to the findings of fact? I think that the findings of fact that I understood from the trial court, Your Honor, was that, look, there's just no facts whatsoever that support agency because there's no facts related to Parkside's controlling the methods or methodology that Tremont was used in obtaining a loan on its behalf. Well, if that's the case, if that's the analysis, judges, there's no broker in Illinois that's going to meet that standard because when you walk into a broker's office, they obviously have their methods and their expert knowledge in obtaining loans that you don't have as a novice or even experienced borrower that you're not going to be able to control because of the knowledge disparity. You're not going to be able to control how they obtain the loan. Well, if we're trying to support you on this, what cases are we to use? I'm not seeing either in your brief or in the other sites anything. It seems you are leaning towards special circumstances. Yes, I am, Judge. And even in the argument, Judge Zwick went to the point of saying she analyzed it using the Benson case and still came to the conclusion that there were not facts sufficient to support you. Judge, the... So I'm saying what are the real special circumstances or what case can we use to support you? Well, I think the case, Judge, the first case is the case Alvarado's. Yeah, but that was a clear case where there was an agency defined in the agreement. And I think that the affiliate makes that point that, you know, since the agreement itself says agent, that that's the determining factor. I would beg to differ, Your Honor. I would say that the fact of the matter is that you can call an agreement anything you want. The fact of the matter is that under Alvarado's versus Cummins, their purpose was to obtain a loan between a mortgage broker and a borrower. I mean, you can say agent or non-agent, but if the purpose is there, if the underlying reason why the relationship between the parties exists is there, I mean, you can call it what it is, but I think you have to go by what the actuality circumstances are, what the functions that are actually being performed by the parties and not what people put as labels on their agreements. The other analysis I would have, I mean, speaking of that is, you know, this agreement says they're consultants, okay, as opposed to mortgage brokers. I mean, so are we just to forget about any agency issues whatsoever because they call themselves consultants? I mean, if you look at what Tremont is obligated itself to do under the terms of the agreement, they're certainly not acting as consultants. They're certainly not, they're acting more than a advisory capacity. They have, you know, promised to obtain a loan on Parkside's behalf. They have promised to negotiate debt financing on Parkside's behalf. That's not a consultant. A consultant advises. It doesn't obtain a loan. It doesn't negotiate terms of a loan. So if you look at the underlying agreements that Parkside had with Tremont, it's called consulting agreement, but it really isn't a consulting agreement. So do we go by what the labels that the parties put on? I mean, which is kind of artful if you think about it. Don't the labels put on, to use your language, don't the labels in the contract, and I'll butcher the name to alabaster or whatever, don't the parties indicate their intent to be bound as agent in principle by adding that or by using that language in the contract and isn't that part of how the court concludes the nature of the relationship? Well, one of the factors in Benson was the presence of attorneys, presence of almost, I won't say adversarial, but a relationship where both parties had equal knowledge of what was going on in the transaction. And the reason I fault the trial court's determination is there were no lawyers here. I mean, if you can read what's going on here, Mr. Shams, on behalf of Parkside, signed every agreement without negotiating anything in any of these agreements. Didn't take them to a lawyer. Signed them all because he trusted. He wasn't precluded from taking anything to a lawyer, was he? Probably not, Judge, but I mean, the bottom line is that there was trust involved here and there was also a timing factor here that everyone was aware of in obtaining a loan. So there's a disparity of knowledge and expertise in the area. There is an exclusivity that the agreements provided Tremont with a tremendous amount of advantage here over Parkside because Parkside was locked in. I mean, they couldn't go somewhere else and negotiate with another broker to obtain a loan. I mean, they were locked in. And the other thing that's going on here in terms of what the relationship with these parties is, is that there was a trust factor that had built in here. I mean, Mr. Shams testified that he did trust Tremont to obtain a loan on their behalf. He did rely on their expertise. That wasn't present in Benson v. Stratford whatsoever. That was one critical distinction that I saw in Benson v. Stratford that the court didn't even address. I mean, it looks solely at whether or not Parkside controlled the means and methods of the way Tremont brokered the loan. Well, that's never going to be the case when the relationship is that of broker to borrower because the broker has superior knowledge all the time. I think that's probably one reason why the Illinois legislature codified fiduciary responsibilities to mortgage brokers in Illinois. Anything else, counsel, or are we kind of getting into time limits? I understand, Judge. The other issue is the Deceptive Practices Act. I mean, that was the third major category. A couple things here, Your Honor, is that the court's decision rested primarily upon reading the three agreements as independent, and the trial court determined that the development agreement was different than the financial consultant agreement. If you look at what the activities and the functions under the development agreement that Tremont was supposed to, or legally obligated to perform under the development agreement, they all relate to obtaining the loan, every one of them. Plaintiff's expert testified that all these three agreements, the purpose of all three agreements was to obtain a loan on behalf of Parkside, obtain a construction loan, obtain $9.5 to $10 million. Tremont was paid a fee of $325,000 when initial closing occurred. What does it tell you about the purpose of the development loan? The purpose of the development loan is to obtain the loan. They have three functions or four responsibilities Tremont had. One of them was to do a financial memorandum to provide to lenders. In fact, that was one of the primary things that Tremont did. The financial memorandum is void solely to obtaining a loan. It really has little or no other purpose than obtaining a loan, and that was one of the requirements under the development agreement. The other thing that I want to point out is that related to referral fees, this is one thing that was really upsetting is that out of the $325,000 that was paid to Tremont, $216,000 went for referral fees. Those referral fees were undisclosed. And would Mr. Shands have agreed to accept those loan terms, or he would accept the loan, or would he have attempted to negotiate his fee at the time of initial closing if he would have known, if it would have been disclosed to him, what the magnitude of those fees were? I mean, to give you a primary example here is that $216,000 out of $325,000 is approximately 70% of the total fee that Tremont received. And Mr. Shands was never made aware of that fact. It gets worse, I think, for the FOA, because if the court's analysis is right, the development agreement is separate than the financial consultant agreement, but the fee under the development of the financial consultant agreement was $150,000, so my client actually paid the entire fee in referral to Tremont. The entire fee under the financial consultant agreement went to an undisclosed third party. And $60,000 of a fee for a referral to obtain a loan under the development agreement went to another undisclosed party related to loan acquisition that was paid out of the development consultant fee that was paid to Tremont. And I submit to the court that if Mr. Shands would have known that, he would have had the opportunity, it would have weighed on his decision whether or not to accept or reject the loan. At the very least, it would have provided him an opportunity at that point in time to renegotiate the terms of the agreement with Tremont, because what happened is Mr. Shands put what I call the Hobson's choice in my brief here. Accept the loan as is, or forfeit the earnest money and forfeit your business opportunity. And the court relied on, I think it's the, what's the name of the case? Dimitri, I think it is. Yeah, Dimitri versus GMAC for the proposition that, I think the court relied on the fact that Parkside had a choice. Well, I don't think the analysis should be whether or not you have a choice. Everyone's going to have a choice, okay, in terms of to accept, to reject. It's the parameters of that choice. It's what are the choices? I mean, these are two terrible choices for Parkside. Lose the business opportunity, forfeit the earnest money, or go ahead with the loan as represented to you that included, as far as Mr. Shands was concerned, included a construction component, included a phase two component. That's it. I think you should be done by now. Yes, I am, Judge. Thank you. Thank you. May it please the Court. As you know from having read the briefs, this was a very fact-intensive case, and the facts were disputed. He said, she said, situation in a lot of cases. The trial court heard the testimony, considered all of the documentary evidence, and ruled in favor of Tremont on all counts of Parkside's complaint. That decision was not against the manifesto of the evidence. Furthermore, Parkside failed to prove that its damages were caused by anything that Tremont failed to do. The evidence at trial established that the project failed because Parkside, because of delays in its getting approval of its developer's public report from the Hawaii Real Estate Commission, and under Hawaii law, a condo developer cannot enter into contract to sell condominium units until that report is approved by the Hawaii Real Estate Commission. In this case, Mr. Shands' testimony, and the testimony of everybody involved in the project, was these condominiums would be jumping off the ship, that this project would sell out in 7 to 14 days. Based upon that, the Bank of Bozeman made a loan to them to acquire this property and gave them six months to obtain the 50 percent presale requirement. They didn't obtain the 50 percent presale requirement within six months. Their public report hadn't even been approved within that six-month period. So the Bank of Bozeman extended the loan by an additional four months, and it was only on the last day, the day that that four-month extension ended, that the condo docs were approved. At that point, the Bank of Bozeman, which had loaned them this money and seen no sales, decided not to extend the loan further. Now, that is why the project failed. Mr. Shands himself testified that in August of 2007, mind you, his report was approved by the Hawaii Real Estate Commission on July 31, 2007. Mr. Shands testified that the real estate market started to go soft in August of 2007, and we all know what happened in 2008 and 2009 in the real estate market. So that is why the project failed, and that is why Parkside suffered the losses it suffered, not because of anything that Parkside or that Tremont did or failed to do. Addressing some of Parkside's argument, they claimed that under their agreements with Tremont, Parkside was required to obtain both an acquisition loan and a construction loan. And in Council's argument, he used that term, an acquisition loan and a construction loan. The financing consultant agreement in this case states under... Well, first of all, it begins by noting that Tremont Realty Capital makes no guarantees regarding the placement or acceptance by a lender. We made no guarantees that we would be able to obtain him any loan. Under the services that Tremont was to provide, it says obtain senior acquisition loan. Experts testified at trial that an acquisition loan is different from a construction loan. They also testified that this was an acquisition loan. An acquisition loan, not surprisingly, is a loan that's made to somebody to acquire something. The expert testified that a construction loan is a loan made to somebody in order to construct something. So when Parkside contends that they entered into an agreement for us to obtain a construction loan, that is simply not the case. The agreements provide that they would be entitled to their success fees if the client closes on any acquisition loan of any kind for the property. No mention of a construction loan. Mr. Kolomets from Tremont testified that in a development situation like this... And Parkside had an opportunity here. Here was some vacant land that had development potential. When a developer sees that opportunity, the most important thing is acquire the opportunity. Take down the land. Acquire the land. Because the land is what represents the value. It's what you're going to develop. And Mr. Kolomets from Tremont testified that was Tremont's focus. Parkside was under time constraints. They had signed a contract to purchase this land in November of 2005, I believe. And there were financing contingencies that had been extended. So he was desperate to obtain a loan to purchase the property in order to preserve the development opportunity that that land provided. And that's why the contracts refer only to an acquisition loan. He says we breached our contract by failing to... One of the services provided in the contract was to assist the client in negotiating the terms and conditions of the debt, equity, and mezzanine financing. There was no mezzanine financing involved here. There was debt and equity. The equity financing was provided by another entity that Mr. Shams of Parkside had arranged beforehand. That was already in place. It's possible there may have been additional equity financing required, in which case Tremont would have assisted with that. But there was no further requirement for equity. The Bank of Bozeman was content with the amount of equity that Parkside's equity investor was putting into the deal. In terms of their damages for our alleged failure to assist them in negotiating the terms of the debt deal, the loan from Bank of Bozeman, there was absolutely no testimony, no evidence in this case, that Parkside was unhappy with the terms of the loan. The interest rate, the term. The only issue they raised was they were upset. They were under the opinion or under the impression that in addition to this initial acquisition loan, there was going to be a commitment in place for additional financing to fund the construction of all of the condominium units, other than the two units which were financed by the initial loan. And that commitment was not in place. Well, it wasn't in place because Tremont was only obligated to assist them in obtaining an acquisition loan. Moreover, defendants exhibit number three in this case, which is, we kind of call it our smoking gun evidence, is a memorandum that North American Capital Markets sent to the Bank of Bozeman in August, August 22nd of 2006, a month before the closure. And in that memorandum, North American Capital said the current total committed dollar amount is approximately $4.4 million of the total amount requested of $10.2 million. Due to time constraints related to taking down the land and having the project appraised, the borrower, Parkside, is seeking to close on the existing bank commitment to fund the cost of the land, etc., etc., etc. The borrower is confident that once the model is built, he will achieve his required 50 percent presale level in 30 to 60 days. As a result, the borrower has agreed to pay the bank's one-quarter percent up-front fee. In addition, the loan will be structured as a six-month note with the same terms and conditions as presented. This loan will be refinanced with a full $10.2 million, and again I'm rounding, construction loan that is expected to be committed to once the borrower achieves the 50 percent presale level. Mr. Shams testified at trial that these statements were true. He knew a month before the closing that Bank of Bozeman had only committed to $4.4 million. If you look at the testimony... Was there any conversation or any communication around this memo or any of the other closing documents or loan documents proposed by Bozeman as the lead lender in the syndication? Was there any communication between Tremont and Parkside? What was the communication? Between Tremont and Parkside? With respect to the syndication. You mean after North American Capital got involved or about syndicating the loan? After. Okay. After Parkside signed the agreement with North American Capital, Mr. Cole-Mance testified that he had weekly conversations with Mr. Shams to ask him, How is it going? How is the Bank of Bozeman loan going? Is there anything that I can do for you? Do you need me to do anything for you? Parkside didn't ask him to do anything. He didn't ask them to... He didn't express any dissatisfaction or unhappiness with the loan terms and said, Hey, the loan terms that Bank of Bozeman is proposing, I don't like them. Could you help me negotiate better terms? Assuming I know that there is an agency relationship and a duty, was Tremont required to offer an opinion or to make any recommendations to Parkside with respect to what was being offered by Bozeman? The terms that they ultimately obtained from Bank of Bozeman were essentially identical to the terms that were set forth in the North American Capital Market Engagement Agreement. Because it said, you're engaging us to help you get a loan and these are the terms. The terms are attached as an exhibit, proposed loan terms. Mr. Palomaeus at Tremont reviewed that document with Parkside. And Mr. Shams signed that document the very day that it was received. That's how anxious he was to proceed with this. Now, there was an issue raised, well, an argument in their reply brief. The Parkside argues that Tremont simply entered into a contract to perform a service and then handed off Tremont to North American Capital Markets, which it characterizes as just another mortgage broker. The testimony in this case was that North American Capital Markets was brought into this because it specialized in loan syndications. Tremont had approached 25 to 40 lenders about providing financing. They weren't interested primarily because Parkside had no prior development experience. They had never done a real estate development. And that's a risky proposition for a bank. And so Mr. Palomaeus was referred to North American Capital Markets by someone he had prior relations with as a company that specialized in syndicating loans. And a loan syndication is where you put together a group of banks and instead of one bank assuming the risk of a $4.4 million loan, you parse that loan out amongst multiple banks. That way, each bank has a lower exposure and they're willing to take on a little more risk if their exposure is reduced to just a piece of the loan. In their reply brief, Parkside argues that North American Capital wasn't a syndicator, that they didn't syndicate this loan. All they did was they placed the loan with Bank of Bozeman and it was Bank of Bozeman that put together the group of the other banks and syndicated the loan. And in this respect, the court obviously rejected that notion, but defendants exhibit number 16, which was admitted into evidence and to which Mr. Champs testified to, is an email from North American Capital Markets to Bank of Bozeman and it's dated September 22, 2006, which is one week before the closing. And it states Mark. Mark Gannon was the chief credit officer at Bank of Bozeman who was the guy overseeing this loan. It says, Mark, attached is the contact list of participants. The participants are the other banks that are participating in the loan. Attached is the contact list. This is a week before the closing. In the last paragraph of his email, he says, following my email, I would suggest that Bozeman send an email to the other banks today introducing yourselves. This is a week before the closing. This document I submit clearly shows that the entity that put this group of participants together was North American Capital Markets. It wasn't Bank of Bozeman. A week before the closing, Bank of Bozeman didn't even have the contact information for these other banks. North American Capital provided them with the contact information and said, contact them and introduce yourself, because North American Capital, that's what they do. They have groups of banks, and this was a testimony at trial. They have groups of banks, syndicates that they work with, and if a loan comes in and they think this is something that we think this bank syndicate will be interested in, or this bank interest it is in, then they syndicate the loan. Their engagement agreement with Parkside clearly reflects that they were acting as a loan syndicator, because the engagement agreement refers 18 times to lead bank. There is only a lead bank in a bank syndicate. And the lead bank in a bank syndicate is typically the bank that has the biggest piece of the loan, but not necessarily, but it's the bank that's going to accept the note. It's the bank whose name is going to appear on all the documents. Parkside claimed it had a Hobson's Choice at the time of closing. Well, if it didn't close, it would lose the opportunity. That's true. That's why it closed. But it closed knowing what Tremont's fees would be, as Judge Zwick stated in her opinion. It was their call. There was no obligation to pay any fee unless an acquisition loan closed, and Judge Zwick noted it was the closing that triggered the obligation, and Parkside chose to close the loan, knowing, based upon Defendants Exhibit 3 back in August, that it was only going to be a $4.4 million loan. On their agency argument, they state that the trial court used the wrong standard. Now, he said that we cited, we didn't cite any mortgage broker cases in our brief where the court applied that standard. But we did, and they did. Parkside cites four cases in its brief, and those are the Hastings, these are federal cases, Hastings v. Fidelity Mortgage, and Whitley v. Taylor B. In both of those cases, federal court cases, the court said the test for agency is whether the alleged principal has the right to control the manner and method, yada, yada, yada, exact same standard that Judge Zwick applied. They cite two other cases, an Illinois case, Kirkup v. Weisgarber and Peterson v. H&R Block. Exact same test. An agency relationship has two components. The principal has the right to control the manner and method in which the agent performs the work for her, and the agent has the power to subject the principal to personal liability. In this case, Judge Zwick applied that exact same test, the same test that was applied in four of the cases cited in Parkside's brief, and concluded we had no right to control, or that Parkside had no right to control the manner and method in which we performed our services, and Tremont had no ability to bind. What about the argument that they were the exclusive entity involved? Well, if you look at Alabastro, which is the case that is probably the most troubling here, Alabastro was a case where the agent, equity, and by that I mean the contractually identified agent, equity financial, was the exclusive agent. But in reading the opinion in that case, I did not see anything that indicated that it was the exclusivity that made it a principal-agent relationship. The court in that case simply stated the agreement between the parties established a relationship of principal and agent. The agreement itself referred to equity as an agent. And I didn't see anything in there that said because it was an exclusive contract, then you're more of an agent. Or if you weren't an agent, you would have been an agent because it's exclusive. Your Honor, I simply haven't seen any case law that the exclusive nature of the contract transforms a relationship which isn't otherwise an agency relationship into an agency relationship. As the court knows, the principal-agent relationship is a factual determination. Unless it's a principal-agent relationship as a matter of law. And we've cited, again, federal court cases, which we believe are persuasive. Anderson v. New Dimension Financial Services, the court said a fiduciary relationship between a mortgage broker and his client does not exist as a matter of law. They went on to state that basically it depends on the factual underpinnings. In Vargas v. Universal Mortgage, the court stated a mortgage broker is not always a borrower's agent. And I'm not suggesting that under no circumstances can a mortgage broker be an agent for a borrower. What I'm stating is it's a factual determination. And the court in this case, having heard the evidence, reviewed the documents, etc., properly concluded that they had not established by a preponderance of the evidence that there was a fiduciary relationship here. One of the points that was raised by Parkside was the alleged reliance and lack of experience and knowledge of Mr. Shams. He was a neophyte that was relying upon Tremont. Yet the testimony at trial was Mr. Shams is a CPA. He served as the chief financial officer for three companies with annual sales of $15 to $90 million. He had significant real estate investment experience. This was his first development. But he had purchased commercial properties, condominiums. The year before he entered into the deal with Tremont, he put together a $3.5 million acquisition of a hotel in Bloomington. So the suggestion, and then amazingly, at trial, he testified that he was able to obtain on his own, without the assistance of any mortgage broker, a $10 million construction loan from the Central Pacific Bank for another condominium project that he was developing at the very same time he was developing the Parkside project. So to suggest that he was reliant on Tremont, he lacked experience and knowledge, it's just inconsistent with the trial testimony that he was able to obtain on his own a $10 million construction loan for another project. I want to take you back just for one moment somewhat to Sherry or Akin's relationship. What should the court make, if anything at all, the argument that Tremont had a duty to disclose with respect to the referral fees paid? One set of fees paid to Carbajal, I believe, who was the individual when the first incident was introduced. In their brief, in the section addressing fiduciary duties and duty to disclose, they cite Robinson versus Merrill Lynch. In that case, the court stated, an agent is subject to a duty to use reasonable efforts to give his principal information which is relevant to the affairs entrusted to him and which, as the agent has noticed, the principal would desire. But the knowledge which you are required to disclose is information which is relevant to the affairs entrusted to the agent. In this case, the affairs entrusted to us were to assist him in obtaining the loan, not our fee. Our fee was fully disclosed. By this standard, if the idea is that you have to disclose information relating to your fees that a principal or client would consider to be relevant in entering into the deal with you, then I, as an attorney, would have to tell my client, I'm going to enter into agreement with you where my hourly rate is $285 an hour. Mind you, I would be willing to do it at $225 an hour because that's relevant, that's information he would want to know. Now, if my principal would, if I was required to disclose that my fee, or I'm going to do something with my fee after I earn it that you might not like, I just don't see any duty to disclose what we're going to do with the fee after we've earned it. Now, they've cited RESPA, which prohibits, expressly prohibits paying referral fees, paying or receiving. Both experts testified at trial, RESPA doesn't apply to a business purpose loan, a commercial loan. That was conceded. In their brief, they argue, if RESPA applied, this would be a violation of RESPA. Well, RESPA doesn't apply. Both experts testified that the payment of referral fees is a common practice in the commercial real estate broker's business. And that neither expert, and mind you, Tremont's expert has worked for 20 years for MassMutual Insurance in their investment division. Morgan Stanley, I can't even remember the name, he has closed $1.7 billion of commercial real estate loans. He testified that he is not aware of any rule or regulation which either prohibits the payment of referral fees or requires the disclosure of those referral fees. Moreover, counsel stated that if he had known of the referral fees, if Parkside had known of the referral fees, it might not have accepted the loan term, or it might have tried to renegotiate the loan terms. Well, the loan terms were known to him long before the closing, and there was no effort to renegotiate the loan terms. And frankly, there was no evidence, none, written or oral testimony in this case, as from Mr. Shims, that he would have done anything different if he had known. He testified that they weren't disclosed to him. Tremont testified that they weren't disclosed to him. But there's no testimony that if I had known these things, I would have acted differently, or I would have done something different. No testimony, no evidence in the record of that. And to prove a claim for breach of fiduciary duty, you have to establish a duty, a breach, and damages flowing from the breach. In this case, the fees were not disclosed. It's Tremont's contention there was no duty to disclose, because the fee itself was disclosed, and what we did with our fee after we earned it is not material. But there's no evidence that, oh, if I had known this, I would have done that, and therefore I was damaged, because had I taken that different course of action, I would not have incurred these losses. There was no testimony to that. Counsel, I expect to wrap up. Okay. That's all I have. All right, thank you very much. Thank you. Thank you. Related very quickly on the agency issue. It sounds like we're sort of in agreement here in terms of what the standard is for when a fiduciary relationship attaches here in Illinois related to mortgage brokers. I cite a case, the First Illinois Bank v. El Camino Resources Limited, which is extremely helpful in the analysis. It says that under Illinois law, the existence and scope of agency relationship are questions of fact to be decided by the trier of fact, unless the relationship is so clear as to be undisputed. I submit to the court that this relationship, that this exclusivity of this agreement, is a key critical factor in determining whether the agency relationship exists between these two. The fact of the matter is that Mr. Freeland indicated, well, hey, look, there's pre-sales here. There's a requirement of pre-sales. We don't get to that point because the fact of the matter is there's a breach at the point of closing and before closing where the plaintiff suffered its damages. We don't, the case goes further. It says analysis of the facts surrounding a particular case is necessary in determining the existence and scope of an agency relationship. In doing so, the trier of fact may make reference to the situation of the parties, their acts, and other relevant circumstances. For purposes of this analysis, it is important to note that a broker is an agent who bargains or carries on negotiations on behalf of his principal as an intermediary between the latter and third persons in transacting business relative to acquisition of contractual rights. I think it's very clear in Illinois that when the court's analysis, she focused on whether there can be control of the methodology used to obtain a loan. And I don't think that's where the issue lies in terms of determining agency and fiduciary relationships. The key is the nature of the relationship between mortgage brokers and borrowers. There's such a disparity of knowledge and expertise. I mean, it's why people go to people with specific knowledge and say, here, this is the loan I need to obtain. I need to obtain a construction loan to develop this property. You obtain this loan for me. There is no ability on the behalf of Mr. Shams who they say is no neophyte. He has all this business experience in the world. And granted he does. He's a CPA. But you know what he doesn't have any business experience in? Obtaining commercial loans. So I think the argument fails that the fact that he's such an experienced businessman in any way contributes to the fact that we should deny agency relationship in this situation. The fact of the matter is he went to a company that specializes in commercial mortgage acquisition to obtain a construction loan and an acquisition loan and a construction loan. He paid to obtain an acquisition loan and a construction loan. Opposing counsel, by the way, is wrong. The plaintiff's engagement letter with North American Capital Markets, I mean, the terms were agreed upon if you look in my brief at the engagement letter. It says type of loan, construction loan, right in the agreement. It doesn't say acquisition loan. It says construction loan. Loan amount, $9.5 million. That's what the agreement says, that the plaintiff signed that he was going to obtain on behalf of, that North American Capital Markets was going to obtain on behalf of Parkside. What did he receive? A $4.4 million loan. What did he pay North American Capital Markets based upon? He paid North American Capital Markets 2% of obtaining a $9.5 million loan, which he never received. Tremont should have been involved in the process of assisting and negotiating not only the engagement letter, but assisting the entire process of loan acquisition and ensuring that Parkside did not overpay for the loan it received. The bottom line is this agreement indicates that he was to receive 2% of the loan acquired, not 2% of a construction of $9.5 million. So my client, Parkside, overpaid $104,000 based upon the clear terms of the engagement letter itself. That should have been caught by Tremont, who had an obligation under contractual terms to review the documents and to assist and to analyze the documents on behalf of Parkside, and that wasn't done. That contractual obligation was not done. That alone cost my client $104,000. Thank you, counsel. You both made outstanding arguments for your clients. We'll review this. And the briefs were pretty well done in the sense that they were readable in contrast to some of the others we'll get. So thank you very much for your time and your efforts.